378 F.3d 373
 Dale W. BRADLEY, individually and as Guardian and Next Friend of their minor children; Tammy L. Bradley, individually and as Guardian and Next Friend of their minor children; JLB and JDB, Plaintiffs-Appellees,
v.
AMERICAN HOUSEHOLD, INCORPORATED, formerly known as Sunbeam Corporation; Stephen T. Moffett, Esq., Defendants-Appellants, and
R. Scott Long; Barbara A. Allen; Thomas L. Vitu; John E. Hall, Parties in Interest.
 No. 03-2341.
 United States Court of Appeals, Fourth Circuit.
 Argued: June 4, 2004.
 Decided: August 6, 2004.
 
 Appeal from the United States District Court for the Northern District of West Virginia, Frederick P. Stamp, Jr. J.
 ARGUED: Walter Estes Dellinger, III, O'Melveny & Myers, L.L.P., Washington, DC; Paul Mogin, Williams & Connolly, Washington, DC, for Appellants. William J. Hansen, McDermott, Hansen & McLaughlin, Denver, CO, for Appellees. ON BRIEF: Pamela Harris, Jessica Davidson Miller, Shannon Pazur, O'Melveny & Myers, L.L.P., Washington, DC, for Appellant Moffett. Robert B. Barnett, Williams & Connolly, L.L.P., Washington, DC; John E. Hall, Eckert, Seamans, Cherin & Mellott, L.L.C., Pittsburgh, PA, for Appellant American Household, Inc., George E. McLaughlin, McDermott, Hansen & McLaughlin, Denver, CO, for Appellees.
 Before WILKINSON, LUTTIG, and MICHAEL, Circuit Judges.
 Vacated and remanded by published opinion. Judge WILKINSON wrote the opinion, in which Judge LUTTIG and Judge MICHAEL joined.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 Dale and Tammy Bradley sued Sunbeam in this products liability action, claiming that their house had caught fire as a result of a defective Sunbeam electric blanket. During discovery, the Bradleys requested access to all returned electric blankets then in Sunbeam's possession, and the district court granted their request in part. But before Sunbeam produced the blankets, the parties settled the case for a substantial sum and agreed to vacate the district court's production order.
 
 
 2
 Nevertheless, the Bradleys later moved to reopen the case, arguing that Sunbeam should be sanctioned for continuing to dispose of blankets both before and after the district court's production order. The district court agreed, and it severely sanctioned both Sunbeam and its attorneys. While some of the sanctions were clearly criminal in nature, they were imposed without the necessary constitutional and statutory safeguards. And to the extent that the sanctions were civil in nature, the Bradleys surrendered those claims when they settled the case. We therefore vacate the sanctions imposed by the district court, and remand the case for further proceedings consistent with this opinion.
 
 I.
 A.
 
 3
 The Sunbeam Corporation manufactured over 32 million electric bedding products between 1990 and 2000.[1] Sunbeam receives approximately 600,000 returned products each year, including those that have allegedly smoked, sparked, smoldered or caught fire. In 1999, for instance, Sunbeam received about 1100 such blanket remnants; in 2000, about 1800.
 
 
 4
 Sunbeam long ago adopted a retention policy to deal with its returned products. Under its policy, Sunbeam retains returned products for as long as they are the subject of a potential claim or lawsuit. Once a customer's complaint has been resolved, the product is marked for destruction, or returned to the consumer upon request. Documentary claim files are not discarded with the product, but instead are retained for an additional two years after the claim is closed.
 
 
 5
 George McLaughlin, the plaintiff's lead counsel in this case, requested the suspension of Sunbeam's policy on numerous occasions, dating back at least to 1998. The purpose of these requests was to determine if the returned blankets had any bearing on pending cases against Sunbeam being litigated by McLaughlin. Stephen Moffett, Sunbeam's lead counsel, replied to McLaughlin each time by explaining that Sunbeam did not intend to change its policy.
 
 
 6
 On September 22, 1999, a fire occurred at the residence of Dale and Tammy Bradley in Moundsville, West Virginia. The Bradleys retained Mr. McLaughlin and sued Sunbeam Corporation, claiming that the fire had been caused by a defective Sunbeam electric blanket. During discovery, the Bradleys sought the remains of, and the claims files for, every returned electric blanket that had allegedly smoked, sparked, smoldered, or caught fire. On August 8, 2000, the magistrate judge ordered Sunbeam to produce blanket remains "in their possession as of the date of the serving" of plaintiff's initial discovery request, which was November 2, 1999. He also ruled that Sunbeam had to produce "claims filed that Sunbeam has in its possession."
 
 
 7
 As a result, Sunbeam set aside all of the blankets then in its possession — on August 8, 2000 — that had also been in its possession nine months earlier on November 2, 1999. However, the Bradleys had not specifically requested that Sunbeam suspend its retention policy, and the magistrate judge had not ordered suspension of the policy on his own initiative. Sunbeam therefore continued to dispose of blankets that had been returned after November 2, 1999, just as it had disposed of blankets returned prior to the magistrate judge's August 8 Order. It is Sunbeam's continuing adherence to its retention policy — both before and after the magistrate judge's August 8 Order — that lies at the heart of this appeal.
 
 
 8
 On November 1, 2000, the United States District Court for the Northern District of West Virginia adopted the magistrate judge's August 8 Order. The parties then dispute whether discovery was forthcoming, but in any event, the Bradleys moved for sanctions. At a hearing on November 17, 2000, the magistrate judge found that Sunbeam and Moffett had "intentionally and willfully refused" to comply with his August 8 Order by not producing the ordered discovery. The magistrate judge fined Sunbeam and Moffett sums of $5000 and $1000, respectively; ordered all discovery produced to the Bradleys' counsel on November 20 and 24; promised to fine Sunbeam and Moffett sums ranging from $5,000 to $125,000 in the event that discovery was not completed on November 20 and 24; threatened default judgment; and scheduled a criminal contempt hearing.
 
 
 9
 On November 20 — the day that Sunbeam had been ordered to produce discovery — Sunbeam and the Bradleys settled their case on the record. Sunbeam agreed to pay the Bradleys $500,000, and to produce 80 boxes of documents for McLaughlin's review. In addition, the parties agreed that the earlier August 8, November 1, and November 17 court orders would be vacated. In December 2000, Sunbeam paid the Bradleys the full settlement amount, and the parties executed a "Full and Final Settlement" that incorporated "the terms and conditions ... specifically set forth and recited on the record" at the November 20 hearing ("Settlement Agreement"). Notably, the Settlement Agreement did not address the production of blanket remains, nor had that issue been set forth at the November 20 hearing as a term or condition of the parties' settlement. During settlement negotiations, Sunbeam had agreed to produce blanket remains in Florida and Mississippi, but this was never incorporated into the Settlement Agreement. On January 16, 2001, the district court dismissed the case, subject to reopening on either party's motion, or for good cause shown, within 90 days.
 
 B.
 
 10
 The parties' settlement was not, however, the end of this litigation. In January 2001, Sunbeam produced the 80 boxes of documents, and McLaughlin tagged 25,000 pages that he wanted copied. Later, with written notice, Sunbeam withheld approximately 300 of the tagged pages as privileged, after what Sunbeam claimed was a more thorough review of the files. As for production of returned blankets, Sunbeam made available blanket remains in its Fort Lauderdale and Hattiesburg offices, and McLaughlin inspected the Fort Lauderdale blankets in January 2001 and the Hattiesburg blankets in June 2002 and February 2003.
 
 
 11
 Nevertheless, in February 2003 the Bradleys moved to reopen the case and enforce the settlement. The thrust of the Bradleys' motion was twofold: first, Sunbeam's withholding of roughly 300 pages from the 80 boxes of documents, and, second, Sunbeam's ongoing destruction of blanket remains. The Bradleys requested that the district court reaffirm the August 8, November 1, and November 17 Orders, which the parties had agreed to vacate at the time of the settlement.
 
 
 12
 On February 20, 2003, the district court granted the Bradleys' motion, reopened the case, and returned the matter to the magistrate judge for a report and recommendation. After an evidentiary hearing, the magistrate judge issued an order faulting Sunbeam for destroying blanket remains following the August 8 Order. The magistrate judge then held a hearing on sanctions, and ordered Sunbeam and Moffett to submit affidavits as to their financial status.
 
 
 13
 On August 4, 2003, the magistrate judge issued his report. As to Sunbeam's withholding of documents, he found that the parties had agreed that privileged documents could be removed during the copying process. The magistrate judge therefore ordered the nearly 300 pages be submitted for in camera inspection, so that he could determine whether they were discoverable. As for the destruction of evidence, the magistrate judge found "that Sunbeam [had] destroyed or failed to produce items which were the subject of a discovery request and a court order." He was particularly troubled by testimony that Sunbeam had not suspended its retention policy while the Bradleys' case was pending. The magistrate judge believed that Sunbeam had an ongoing duty, before and after the August 8 Order, to preserve blanket remains in anticipation of litigation. He recommended that Sunbeam be fined $200,000; that Moffett be fined $100,000; and that copies of his report be forwarded to the attorney disciplinary boards in the states in which Moffett was licensed.
 
 
 14
 On September 30, 2003, the district court largely adopted the magistrate judge's report and recommendation. Like the magistrate judge, the district court ordered Sunbeam to submit the 290 removed pages for in camera review. Neither party contests this portion of the district court's order. What the parties contest are the district court's findings with regard to Sunbeam's destruction of blanket remains. According to the court, Sunbeam had an initial duty under the Federal Rules of Civil Procedure to preserve blanket remains once it learned of the Bradleys' lawsuit, as well as a further duty to supplement discovery with blankets returned after the August 8 discovery order. Because Sunbeam had discarded blankets after the Bradleys' discovery requests and continued discarding blankets after the district court's August 8 Order, the district court concluded that sanctions were in fact appropriate. The court then fined Sunbeam $200,000 and Moffett $100,000; it ordered Sunbeam to pay the Bradley's fees and expenses resulting from the motion for sanctions; and it forwarded its order to the relevant attorney disciplinary boards. Sunbeam and Moffett now appeal those sanctions.
 
 II.
 
 15
 Sunbeam and Moffett claim that the sanctions were invalid, because they were criminal in nature but were imposed without the procedural protections required for a finding of criminal contempt. We agree, at least in part. The district court's imposition of substantial fines was doubtless an improper criminal sanction. As for the court's notification of disciplinary authorities and its levying of attorney's fees and expenses, even if those sanctions are denominated civil rather than criminal, they should not have been imposed in light of the Settlement Agreement.
 
 A.
 
 16
 We shall address the criminal sanctions first. The district court did not believe that it was conducting criminal contempt proceedings. However, we cannot take the court's characterization of its own proceedings as either civil or criminal to be determinative; we are required to decide that matter for ourselves. Buffington v. Baltimore County, 913 F.2d 113, 133 (4th Cir.1990) (citing Shillitani v. United States, 384 U.S. 364, 369, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966)). Here, the district court believed that Sunbeam had a duty, under both the Federal Rules of Civil Procedure and the magistrate judge's August 8 Order, to preserve and produce the remains of returned electric blankets. In the district court's view, Sunbeam had failed in that duty throughout the pendency of the litigation. The court therefore imposed various sanctions on Sunbeam and Moffett in the name of its inherent authority to sanction a litigant for the destruction of relevant evidence, as well as its authority under Federal Rule of Civil Procedure 37 "to make orders as are just" and to "impose appropriate sanctions."
 
 
 17
 Of those sanctions, there can be little doubt that the fines were criminal in nature. As the Bradleys concede, the weighty fines were intended to punish Sunbeam and Moffett rather than to compensate the Bradleys. The basic difference between civil and criminal contempt sanctions is that civil contempt sanctions are intended "to coerce the contemnor into compliance with court orders or to compensate the complainant for losses sustained," while criminal contempt sanctions are intended "to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct...." Buffington, 913 F.2d at 133; see also Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 829, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994).
 
 
 18
 This court faced essentially the same situation in Buffington, where the district court — likewise relying on its inherent power and its authority under Federal Rule of Civil Procedure 37 — had imposed fines of almost $7,000 on two attorneys accused of violating a discovery order. See 913 F.2d at 132-33. The fines had been labeled "strictly compensatory." Id. at 133. However, we found them to be criminal sanctions because the fines were payable to the court rather than to the complaining party; they were not conditioned on compliance with a court order; they were not tailored to compensate the complaining party; and they were imposed for punitive purposes. See id. at 134-35.
 
 
 19
 The present case mirrors Buffington. First, the fines here were made payable to the court, not to the Bradleys, and they were not conditioned on compliance with any court order. See id. at 133 (quoting Hicks v. Feiock, 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988) ("If the relief provided is a fine, it is remedial when it is paid to the complainant, and punitive when it is paid to the court, though a fine that would be payable to the court is also remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order.")).
 
 
 20
 Second, the amounts of the fines were not determined by reference to any losses incurred by the Bradleys as a result of Sunbeam's alleged failure to complete discovery. See id. Indeed, the district court awarded attorney's fees and expenses to the Bradleys "to compensate" them for their time and trouble in filing the motion, and then proceeded to impose the fines as a penalty for Sunbeam's apparent discovery abuses. In setting the fines at $200,000 on Sunbeam and $100,000 on Moffett, the magistrate judge made clear that it was seeking amounts commensurate to Sunbeam's and Moffett's perceived wrongdoing; it did not even discuss any harms suffered by the Bradleys either before or after the Settlement Agreement.
 
 
 21
 The courts have found fines far less substantial than those imposed here to require the procedural protections that accompany criminal contempt sanctions. See, e.g., Jake's Ltd. v. City of Coates, 356 F.3d 896, 901 (8th Cir.2004)(holding $68,000 contempt sanction to require criminal procedure protections); Mackler Prod., Inc. v. Cohen, 225 F.3d 136, 142 (2d Cir.2000)(holding $2,000 contempt sanction to require criminal procedure protections); Buffington, 913 F.2d at 132-33 (holding $7,000 contempt sanction to require criminal procedure protections). Thus, in form and in substance, the district court's fines were meant to vindicate its own authority by punishing Sunbeam and Moffett for what the court saw as their refusal to complete discovery in a timely fashion. See Buffington, 913 F.2d at 134-35.
 
 
 22
 In imposing the fines, the district court relied on its inherent authority to sanction a litigant for the destruction of relevant evidence, as well as its authority under Federal Rule of Civil Procedure 37 "to make orders as are just" and to "impose appropriate sanctions." However, we have previously made clear "that a Rule 37 fine is effectively a criminal contempt sanction, requiring notice and the opportunity to be heard." Hathcock v. Navistar Int'l Transp. Corp., 53 F.3d 36, 42 (4th Cir.1995). "Criminal contempt is a crime in the ordinary sense," and "criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings." Bloom v. Illinois, 391 U.S. 194, 201, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968); Hicks v. Feiock, 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). At a minimum, criminal contempt defendants have the right to receive notice of the criminal nature of the charges, Richmond Black Police Officers Ass'n v. City of Richmond, 548 F.2d 123, 126 (4th Cir.1977), and to be prosecuted by an independent prosecutor, Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 445-50, 31 S.Ct. 492, 55 L.Ed. 797 (1911), and to have their guilt determined "beyond a reasonable doubt." Id. at 444, 31 S.Ct. 492; See also Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 798, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). Perhaps because the district court did not believe it was conducting criminal contempt proceedings, it failed to provide any of these basic procedural protections.
 
 
 23
 The fines here were for criminal contempt, and yet were imposed without the procedural protections necessary for a judgment of criminal contempt. Our system cannot condone such asymmetry.
 
 B.
 
 24
 The Bradleys contend that the remaining sanctions — the notice to the disciplinary boards and the substantial award of attorney's fees and expenses — are civil sanctions, untainted by the absence of procedural safeguards. Calling the sanctions civil, however, does not aid the Bradleys. Even assuming that these sanctions are civil rather than criminal in nature, they should not have been imposed in light of the Settlement Agreement.
 
 
 25
 On November 20, 2000, Sunbeam and the Bradleys agreed to settle their litigation, and they described the terms of their agreement to the court. The main features of the negotiated settlement were a $500,000 payment from Sunbeam to the Bradleys, and an agreement that the district court would vacate the August 8, November 1, and November 17th orders regarding blanket production. Mr. Moffett explicitly clarified — with Mr. McLaughlin's confirmation on the record — that "the cashing of the checks is with the understanding that the orders [ ] be vacated."
 
 
 26
 Neither party has made any claim of a fraudulent inducement to settle. Neither party is seeking rescission of the Agreement or relinquishing its claim to any of its benefits. The record reflects that both Sunbeam and the Bradleys negotiated and compromised their differences with all eyes open. At the end of the hearing, the district court approved the settlement, which Mr. McLaughlin explained would be consummated once Sunbeam's checks had cleared. The $500,000 payment cleared in December 2000, upon which the parties signed a "Full and Final Settlement." This written agreement incorporated the terms set forth at the November 20 settlement conference and wrapped up "all claims ... mentioned in, arising out of, or related to the Lawsuit." Shortly thereafter, the district court dismissed the case, subject to re-opening "for good cause shown." Nearly three years later, on September 30, 2003, the district court sanctioned Sunbeam and Mr. Moffett for spoliation of evidence related to this lawsuit. Given the circumstances of this case, we find the post-settlement imposition of sanctions unwarranted.
 
 
 27
 We need not speak broadly. We do not exclude the possibility that sanctions of some sort may be necessary in some cases to ensure the proper functioning of judicial process notwithstanding a negotiated settlement agreement. Our focus here is on this particular award of sanctions in the aftermath of this particular Settlement Agreement. For the reasons that follow, we conclude it was error for the district court to impose compensatory sanctions, and their imposition here amounted to an impermissible reformation of the settlement reached by the litigants.
 
 
 28
 To begin with, the Bradleys and Sunbeam clearly intended to reach an integrated agreement. Indeed, the document is explicit "that this Settlement Agreement contains the entire agreement between the Parties." Both parties had the expectation that the terms of the settlement to which they consented — the written terms and the terms discussed at conference — marked the outer limits of their obligations.[2] Courts enforce only those settlement terms on which the parties have reached agreement. Hensley v. Alcon Lab., Inc., 277 F.3d 535, 541 (4th Cir.2002). Indeed, we have held it to be "improper for the district court ... to place itself in the role of `final arbiter' of a settlement agreement." Ozyagcilar v. Davis, 701 F.2d 306, 308 (4th Cir.1983).
 
 
 29
 Yet that is unfortunately what happened here. As part of the consideration for the $500,000 payment from Sunbeam, the Bradleys gave up their right to pursue additional sums. Were we to uphold the award of compensatory sanctions in this case, we would risk augmenting the precise settlement figure that the parties had negotiated and agreed upon. Motions to enforce settlement agreements draw upon standard contract principles. Hensley, 277 F.3d at 540. The sanctions here compensated the Bradleys for the very things they had agreed contractually to forego. This is not the role that our precedents encourage courts to play.
 
 
 30
 The imposition of sanctions is made more problematic by the fact that the Settlement Agreement does not address blanket production or destruction at all. Yet the sanctions were imposed at least partially on those grounds. Reopening the case was proper on the issue concerning the 300 potentially privileged documents because that controversy sprang directly from the terms of the negotiated settlement. Reopening the case on the issue of product production was another matter, however.
 
 
 31
 The written agreement contains no mention of blanket production, and nothing concerning blankets was discussed at the November 20 conference. This omission is not surprising. The Bradleys were settling their case, and the blankets would only have been useful in further litigation, which they were agreeing to forego. To allow a party to pursue claims beyond the terms of the final settlement begs the question of just what legal interest that party continues to possess. To further sanction Sunbeam for delinquent blanket production, or no blanket production at all, was to move beyond the contours of the Settlement Agreement. Again, the perception is that of a court improperly modifying a final settlement, not merely enforcing it. See Ozyagcilar, 701 F.2d at 308.
 
 
 32
 Moreover, the Settlement Agreement by its terms specifically called for the district court to vacate its November 1 and November 17 orders, in addition to the magistrate's original August 8 order. The Agreement expressly incorporated the terms set forth at the November 20 hearing, and included an attached copy of the hearing transcript. At that hearing, Mr. Moffett clarified that "the settlement is contingent on the Court having the ability to vacate those [November 1, November 17, and August 8] orders." Mr. McLaughlin then explained that "everything [would] be stayed pending the checks clearing, at which point it is understood this Court would then vacate those orders before entry of the dismissal order." It was the magistrate's August 8 order that covered the production of blanket remnants. Put simply, once the checks had cleared and the case was settled and dismissed, Sunbeam was under no obligation to produce blankets to the Bradleys at all. We must presume that one of the bargaining objectives for Sunbeam was to put the issue of blanket production — and the orders pertaining thereto — behind it. Negating the outcome of negotiations by imposing belated sanctions on these orders was not an appropriate judicial course.
 
 
 33
 Finally, in section three of the "Full and Final Settlement Agreement," the plaintiffs promised to "fully and forever release, acquit and discharge the Defendant from and against any and all claims, actions ... demands and fees (including attorney fees), of any kind or description whatsoever in law or in equity, now known or hereafter discovered." The Agreement thus explicitly protects the defendants from further fee requests. The fact that plaintiffs now seek substantial attorney's fees not for enforcing the settlement, but for a motion that has no basis in the settlement, only highlights the incongruence between the Settlement Agreement and the sanctions award.
 
 III.
 
 34
 In sum, the sanctions imposed on Sunbeam and Moffett suffer from several infirmities. The $200,000 and $100,000 fines were improperly imposed because, as in Buffington, they constitute criminal contempt penalties, and therefore cannot be issued without accompanying criminal procedure protections. Assuming that the attorney's fees and other sanctions are civil in nature, they are nonetheless invalid because their imposition is irreconcilably at odds with the negotiated Settlement Agreement. We respect the concern of courts for the proper functioning of the judicial process. But settlement agreements too are part of the dispute resolution process to which courts themselves owe a measure of respect. All sanctions imposed on Sunbeam and Moffett by the district court's September 30, 2003 order are hereby vacated and the case is remanded for further proceedings consistent with this opinion.
 
 
 VACATED and REMANDED
 
 
 
 Notes:
 
 
 [1]
 Defendant-appellant American Household, Inc. is the recent post-bankruptcy successor to the Sunbeam Corporation, but for convenience we continue to refer to the defendant as Sunbeam
 
 
 [2]
 The record contains evidence of a collateral understanding reached by counsel during the settlement discussions regarding inspection of blanket remains held in Florida and Mississippi. As the Bradleys concede, this understanding does not appear in the written Settlement Agreement, nor is it incorporated by virtue of having been discussed at the conference. This collateral agreement is of little significance now because those blanket remains appear to have been made available for Mr. McLaughlin's review